## KINSLER vs. HOLMES.

Three devisees of a tract of land, who were, also, named as the executors of the will, and two of whom had qualified as executors, established a ferry on the devised tract, under a charter granted to them by the State, at a place where a river formed one of the boundaries of the tract. There were unsatisfied judgments against the testator, to a considerable amount, besides other debts, and his estate proved to be insolvent. On bill to marshal the assets: *Held,* That the executors were not bound to account to creditors for the profits of the ferry.

Devisees of an insolvent testator are not liable to creditors of the estate for rents and profits during their possession before sale.

Lapse of twenty years, with other circumstances: *Held,* To raise the presumption that a judgment was satisfied, although during five of the twenty years the stay law was of force and war existed.

Under a bill to marshal the assets of an insolvent estate, a debt, contracted by the executors, cannot be proved as a claim against the estate. (*a.*)

A sum paid by executors to a watchman for guarding real estate of the testator, under a contract with the executors, will not be allowed as a disbursement against judgment creditors of the testator—*semble.*

BEFORE HON. JAMES H. RION, SPECIAL JUDGE, AT COLUMBIA, JANUARY, 1871.

John J. Kinsler died in January, 1865, leaving a last will and testament, of which his three brothers, Edward Kinsler, Henry O. Kinsler and William Kinsler, were nominated executors. The two former proved the will and qualified as executors. The testator left very little, if any, personal estate, but a considerable amount of real estate, consisting of about twenty lots in the city of Columbia, other lands in Richland County, including a tract near Columbia, on the east bank of the Congaree River, known as the Brick Yard, and lands in Lexington County, among them a tract known as the Percival land. The will contained a residuary clause, by which the testator devised the residue of his real estate to his three brothers above named, and under this clause they became seized, as tenants in common, of the brick yard tract.

At the fire which destroyed the principal part of Columbia, in February, 1865, when General Sherman's army occupied the city, the buildings of the testator, on his lots, were burned.

In December, 1865, the three residuary devisees petitioned the Legislature of the State to grant them a charter for a ferry over the Congaree, at the brick yard, stating, as one of the grounds of their application, their ownership of the soil on the east bank of the

(*a.*) A person cannot, by contract with an executor, acquire a right to prove as a creditor against the estate.— *Farhall* vs. *Farhall*, (Nov. 18, 1871) Law Rep., 7 Ch. Ap., 123.                                                    R.

river, where the landing on that side would be. The Legislature granted them the charter, and the ferry was established and went into ·operation.

The bill, in this case, was afterwards exhibited by the two qualified executors against Mary Holmes, a judgment debtor of the testator, and William Kinsler and other his devisees. The bill was for administration of the estate. It alleged the insolvency of the testator, and prayed the usual decree for sales of the real estate, and for calling in creditors to prove their debts.

Under a decree in the cause, the real estate was all sold in December, 1868, and April and June, 1869. The proceeds of all the sales, except that of the Percival land, amounted to $54,111.16. The Percival land was sold to William Kinsler, for $2,403.35, and his bid was paid by crediting the same on his mortgage, hereinafter more particularly mentioned.

By an order made in June, 1867, it was referred to a Referee, to call in creditors, and report on their claims, and to take and state the accounts of the executors. Eleven judgments and four tax executions against the testator, dating from February, 1849, to October, 1861, and amounting, in the aggregate, to a large sum, were proved before the Referee. Two mortgages, one in favor of William Kinsler, on the Percival land, and one in favor of George Kaigler, for $6,000, on a lot called the Jordon lot, besides specialty and simple contract debts, were also proved. The only disputed matters were the three'to be now mentioned:

1. It was contended, on behalf of some of the creditors, that the devisees of the brick yard took the charter of the ferry, which was granted to them by the State because they were the legal owners of the soil, as trustees, for the benefit of the creditors, and that the executors were liable to account for the rents and profits. This position was sustained by the Referee, and he recommended that the franchise of the ferry " be sold, and that the executors be required to account for the rents and profits, as assets to which the creditors were entitled."

2. William Kinsler presented a claim against the estate for $1,846.65, being the balance alleged to be due to him on a bond of the testator for $8,000, conditioned for the payment of $4,000, to secure which the mortgage above mentioned of the Percival land had been given. The bond and mortgage bore date the 27th September, 1848, and, as already intimated, the claim, so far as the mortgage was concerned, was not disputed, and he had received

the benefit of his mortgage lien by his purchase of the Percival land. What he now claimed was that he was entitled to rank as a judgment creditor for the balance of his debt. Under the original order made in the case, the time allowed creditors to present their claims expired on the 1st January, 1868, and this claim to rank as a judgment creditor was not presented until the 20th October, 1868, after an order to extend the time had been made on the application of this claimant.

To establish this claim, it was proved that the records of the office of the Clerk of the Court of Common. Pleas for Richland were burned in February, 1865, and a certificate of the Clerk of said Court was produced and received in evidence, which stated as follows : " Abstract of judgment in the case of John Bryce and Catharine. McFie, administrators- of J. McFie vs. John J. Kinsler, to wit: Judgment for plaintiffs, Fall Term, 1848, for $2,500; interest on $2,500 from 1st January, 1849 : date of substitution, November 16, 1868; fi. fa. issued 20th November, 1868, as of the —— day of October, 1848."

William Kinsler testified that the indebtedness of John J. Kinsler to him arose in the following manner: That Daniel Kinsler, as principal, with the witness and John J. Kinsler as sureties, was indebted to the administrators of McFie by bond, in the sum of $5,000 ; that the bond was put in suit, and he (the witness) then paid one-half the debt, with the accrued interest, in cash, and the other half, $2,500, by giving his bond, with Frost and Shuler as sureties ; that he afterwards paid this last mentioned bond ; that the payment to the administrators of McFie was made before their judgment was recovered ; that the judgment was for $2,500, and was against himself and John J. Kinsler ; that the mortgage of the Percival land was given to secure witness against his liability on the bond to the administrators of McFie ; did not know why it was given for $4,000.

It appeared by a return of the administrators of McFie, filed in the Ordinary's office, February 9th, 1849, that the bond of Daniel Kinsler, John J. Kinsler and Wm. Kinsler, for $5,000, had been paid as follows:

1848.
July.1.   By 20 shares Bank of Hamburg, $50............$1,000 00
          By cash..................................:.... 1,608 00
          By bond of William Kinsler, J. D. Frost, J. Shuler 2,500 00
          By J. J. Kinsler's note, endorsed by J. D. Frost.   180 57
                                                          _____
                                                          $5,288 57

Principal of bond.......................$5,000 00
Interest to time of payment...........  288 57   $5,288 57

It was admitted that Wm. Kinsler had been in possession of the Percival land for nineteen years, and the balance claimed by him was ascertained as follows:

Debt.............................................$2,500 00
Interest for 20 years............................ 3,500 00—$6,000 00
Deduct rent of Percival land.................. 1,750 00
Bid for Percival land........................... 2,403 35— 4,153 35

Balance..... ..............................................:....$1,846 65

The Referee rejected the claim of Wm. Kinsler to rank for this balance as a judgment creditor, on the grounds: 1. That the evidence was insufficient to establish the fact that the alleged judgment was recovered; and, 2. That, if it was recovered, it must be presumed to be satisfied.

3. J. B. Gibson presented a claim against the estate as follows:

*Edward and Henry O. Kinsler, Executors of John J. Kinsler, deceased, to J. B. Gibson,*

DR.

1868.

October 21. To service as guard and watchman over the property of the estate of John J. Kinsler, deceased, commencing July 13, 1866, making to this date 831 days, at $2 per day, by contract.............................. $1,662 00

CR.

By cash of executors at sundry times........  177 50

Balance............................................ $1,484 50

To sustain this claim the following witnesses were examined:

Edward Kinsler sworn, says:

As one of the executors of the estate of J. J. Kinsler, I employed Mr. James B. Gibson to act as a guard over the property of the estate; we saw that bricks were being stolen in Columbia, fences burnt and iron stolen, and wood being cut on the property of the estate, and as the executors lived five or six miles in Lexington Dis-

trict, it was thought expedient to employ a watchman to protect the property. The wood was mainly cut from the brick yard property in Richland District, and in the sand hills in Richland. My brother, the other executor, also lived with me in Lexington. He agreed to give Mr. Gibson $2 per day for his services. Could not get reliable men to do the same duty for less. Mr. Gibson commenced his duties in the summer of 1866, and continues to be so employed up to the present time; no more depredations (that I am aware of) were committed after we employed Mr. Gibson; was not often in Columbia myself.

James B. Gibson sworn, says:

Was employed by the executors to act as guard on 13th July, 1866; I then entered upon my duties; I made it my business to attend to the business and nothing else; I had at least twenty pieces of property in Columbia to look after; the kind of property which was being lost or stolen was wood, iron and brick on the burnt premises, and at the brick yard; there are now loose brick on the burnt premises; all the old iron has been gathered up and sold; I went over the property, or some of it, every day, sometimes in Lexington, sometimes at brick yard, sometimes in the sand hills of Richland District; have detected persons committing depredations; I continue to act as guard at the present time; no depredations have been committed very lately; have devoted my time to nothing else but looking after the property since I took charge of it; I was to get $2 per day; I rented out some few cottages; I got $177.50 in payment, from rent of some cottages, received from negroes.

*Cross-Examined.*—The wood was taken from a tract known as Palmyra, in the Richland sand hills; several parties were engaged in hauling; some few lots had pine trees on them from which wood was cut; some was also cut from the brick yard, mostly by negroes; some wood was also cut in Lexington.

The credit of $177.50 was claimed by the executors as a payment to be allowed them on their accounts, and the balance, $1,484.50, was claimed by Gibson against the estate as a preferred debt.

The Referee rejected both claims.

The case came before the Circuit Court on exceptions to the report of the Referee, and His Honor made the following decree.

On hearing the report of the Special Referee, and on motion of J. P. Carroll, representing certain of the parties, it is :

Ordered, That the said report be confirmed, and do stand as the

judgment of the Court, except in so far as it is hereby overruled in the following particulars, that is to say:

That so much of said report as relates to the judgment of the administrators of McFie, claimed by William Kinsler, be overruled.

That so much of said report as relates to the ferry, and its rents and profits, be overruled.

The executors appealed from so much of the decree as disallowed the credits for payments made to, and amount yet due to J. B. Gibson, on the grounds:

1. That, under the peculiar circumstances, the daily employment of a watchman was necessary for the protection of the property of the estate, and the creditors have derived the benefit of the services so rendered.

2. That the amount agreed to be paid for said services was reasonable.

David B. Lewis, one of the defendants, also appealed from the decree, on the grounds:

1st. Because His Honor erred in overruling the position taken by the Referee, in his report with regard to the ferry and its rents and profits.

2d. Because His Honor erred in overruling so much of the report as is adverse to the judgment claimed by William Kinsler by subrogation to the rights of the administrators of McFie, original plaintiffs, against his co-surety, John J. Kinsler.

*Barnwell & Monteith, Talley, Bachman & Waties, Lesesne & Miles, Pressley, Lord & Inglesby,* for creditors.

*Carroll,* for grantees of the ferry:

1. In December, 1865, when the grantees obtained the grant of the franchise now in controversy, the residuary devisees had the right to enter upon the lands devised to them, and to receive and appropriate to themselves the rents and profits, with every casual benefit and advantage incident to the legal ownership of the same.— Co. Lit., 111, a.; *Gibson* vs. *Farley,* 16 Mass. R., 285; *Schwartz's Estate,* 14 Pennsyl., 2 Harris, 42; 2 Story's Eq. Jurisp., § 1017; *Wilson Ex parte,* 2 V & B., 251; 4 Kent, 156, 157.

2. The residuary devise was not absolutely void, but voidable only by the testator's creditors, and even in respect of them it continued valid and effectual until the lands devised were sold, and the

possession of the residuary devisees divested, or at least until the decree was pronounced for sale of the premises to satisfy the testator's debts.—*Fripp* ·vs. *Talbird,* 1 Hill Ch., 142, and cases there cited; Statute 3 and 4, W. and M., 2 Stat., 533, 534.

3. The Ferry franchise was not parcel of the land on the eastern bank of the river, nor in any wise an appurtenance or appendage of the same. It was essentially a privilege of a public nature, which might lawfully have been granted without regard to the ownership of the landing places; and although it has been the public policy, in making such grants, to prefer the owners of the landings, if otherwise unobjectionable, yet the General Assembly have never recognized, as having any claims upon their favor in that regard, mere creditors having no property in the land, and only entitled to have such land subjected to the payment of their debts.— *Young & Calhoun* vs. *Harrison,* 6 Geo. R., 130; *Boynton* vs. ' *Peterb. & Shirly R. R. Co.,* 4 Cush., 467; *Gourdin* vs. *Davis & Lehre,* 1 Bail., 469.·

*Pope* and *Haskell,* for the grantees of the ferry franchise, submitted the following points in support of the decree:

1. *a.* That the ferry franchise never belonged to John J. Kinsler, the testator.—3 Kent, 458 ; 2 Black., 37.

*b.* And therefore could not be subject to the claims of his creditors.—Williams on Ex'ors, p. 1408.

2. That the charge made by the Referee that the grantees of the ferry franchise obtained the grant from the Legislature by false suggestion of ownership of the landing on one of the banks of the river, is not true in fact; and, if true, is irrelevant and of no legal force in support of the Referee's report.—*Stark* ads. *McGowan,* 1 N. & McC., 387, 397, note; *Stark* vs. *McGowan,* 1 N. & McC., 399; *Rutherford* vs. *McGowan,* 1 N. & McC., 17 ; *Gourdin* vs. *Davis and Lehre,* 1 Bail., 469.

3. That the grantees of the ferry franchise do not, in that character, stand in a fiduciary relation to the estate of the testator, or, as holders of the franchise, bear any relation whatsoever to the estate, but are parties in a contract with the State of South Carolina, and cannot, according to the facts as presented by the Referee, be "construed to be trustees for the creditors in regard to said ferry and its rents and profits."

Constructive trust arises only when the executor derives profit from "an act which is within the scope of his authority."—Story Eq., §§ 1,211 and 1,261.

A franchise does not come within the scope, unless, by *renewal,*

the trustee or executor gets in his own name that which had been vested in testator.—Williams on Ex'ors, 1408; Lewin on Trusts, 203, 220. So in case *Huson* vs. *Wallace*, 1 Rich. Eq., 1; *Keech* vs. *Sandford*, 2 Eq. C. Ab., 741; *Tastor* vs. *Marriott*, Amb., 668; *Rawe* vs. *Chichester*, Amb., 715.

RULE.—"If trustees, mortgagees and persons interested, *obtain renewal*, the new lease is always subject to the trusts and limitations of the *old.*"—*Owen* vs. *Williams*, Amb., 734; *James* vs. *Dean*, 11 Vesey, 383; 15 Vesey, 236.

4. That the creditors of the testator—not as creditors, but as individuals—had as much right as the executors to apply to the Legislature for the ferry franchise. That the grantees of the ferry franchise did not apply as executors; and that the conclusion of the Referee that they have injured the creditors is illusory, and was properly overruled as being subversive of the absolute rights of the parties grantees.—3 Kent, 458—Nature of a Franchise; *Gourdin* vs. *Davis and Lehre*—cited above; *Rutherford* vs. *McGowan*—cited above.

*Carroll & Melton*, in support of the right of executors to be allowed the expense incurred in the services of J. B. Gibson as a watchman. This point covers the item of $177.50, paid by the executors to Gibson, which the Commissioner disallows, as also the remainder of the claim.

1. An executor must manage the estate as a discreet and prudent man would manage his own affairs. If he fail to protect the property of the estate from avoidable injury and loss, he will be held responsible for such neglect.

2. An executor must himself determine what is necessary to this end in any given case. He needs not to have the direction of the Court to authorize an expenditure which he may think necessary.—Hill on Trustees, *570.

3. An executor is to be allowed all reasonable and necessary expenses incurred in the discharge of his trust.—2 Wms. on Executors, *1315; Hill on Trustees, *570.

4. Under the peculiar circumstances of this estate, the employment of a watchman was necessary to the protection and preservation of the property pending this litigation. *Prima facie* any expense incurred by an executor for that purpose is a necessary expenditure. The *onus* is upon those who impeach it to show that it was unnecessary, improper and unreasonable. No testimony is offered contradictory of that offered by the executors. The charge

of $2 per day is not an unreasonable charge for the services rendered.

5. The expenditure was incurred for the protection and preservation of the very property from which this fund arises. The creditors have received the benefit of the services rendered.

Statement of facts omitted in brief—John J. Kinsler died in January, 1865. Letters testamentary were granted to the complainant the same year. This bill was filed March 13, 1867.

In support of the equity of Wm. Kinsler to be subrogated to the rights of plaintiffs in the judgment of administrators of McFie vs. Wm. and John J. Kinsler:

1. According to the testimony of Wm. Kinsler—which is not contradicted by any other testimony—this judgment was obtained against Wm. and John J. Kinsler, as sureties of Daniel Kinsler. After suit brought, and before judgment, Wm. Kinsler paid his moiety of the debt. The judgment went against both for the moiety of John J. Kinsler; which judgment Wm. Kinsler afterwards paid.

2. As between these two sureties this judgment was exclusively the debt of John J. Kinsler; and for its payment, Wm. Kinsler was the surety of John. It was so recognized by John, who assumed it, and executed to William a mortgage of the Percival land for his security.—*Stokes* vs. *Hodges*, 11 Rich. Eq., 149. The right of Wm. Kinsler to be subrogated, (the mortgage having failed fully to indemnify him,) rests, in this view of the case, not alone upon general principles of equity, but upon the very terms of the Act of 1849.— 11 Stat., 556.

3. Upon general principles of equity, independently of any special recognition by John of his liability to William, the latter as a co-surety and co-defendant in the judgment would have an equity to be subrogated.—*Barrows* vs. *McWhann*, 1 DeS., *409; 1 Leading Cases in Equity, 160, (3d Am. Edition, notes to *Dering* vs. *Winchelsea;*) *Cuyler* vs. *Ensworth*, 6 Paige, 32.

4. The rule in *Burrows* vs. *McWhann* is not in terms overruled in *Bank* vs. *Adger*, 2 Hill Ch., 267. The principle upon which the latter case was decided, to wit: that a surety who pays the debt stands as a simple contract creditor for money paid, is subsequently ruled otherwise in *Smith* vs. *Swain*, 7 Rich. Eq., 112, and in *Stokes* vs. *Hodges*, 11 Rich. Eq., 149. See comments on *Copis* vs. *Middleton* in *King* vs. *Aughtry*, 3 Strob. Eq., p. 156.

5. By the law of this State, the liability between co-sureties to

contribute, is absolute and unqualified. It is not requisite that a surety who pays the debt shall exhaust the principal debtor before he can go upon his co-surety for contribution.—*Lucas* vs. *Curry's Ex'rs.*, 2 Bail., 403. This is not the case of a creditor who has two funds against which he can proceed.

6. Presumption of payment from lapse of time is rebutted by the testimony, as also. by the continued existence of the mortgage. The same presumption would apply with nearly equal force to many of the other judgments. The records of all have been destroyed, and all of the creditors stand upon judgments substituted under the Act of 1865.

Aug. 8, 1871. The opinion of the Court was delivered by

Moses, C. J. John J. Kinsler died in January, 1865, leaving a last will and testament, of which his brothers, the plaintiffs, with another brother, William Kinsler, were appointed executors. The plaintiffs alone qualified. The brief does not furnish us with a copy of the will, and the only disposition which it contains that has been brought to our notice, is that which makes the three brothers the residuary devisees, and as such entitled to a certain piece of land known as the brick yard tract, situated on the eastern bank of the Congaree River, "near the old Columbia Ferry." In December, 1865, they applied to the Legislature for a charter of a ferry across the said river, at a point indicated in their petition, which was granted with such rights and privileges as pertain to franchises of the like character.—13 Stat., 53. A bill was filed by the plaintiffs to marshal the estate, and by the usual order creditors were required to present their demands. On the examination of the accounts of the executors, it was claimed they held the ferry for the benefit of the estate, and that the creditors had a right to the rents and profits which accrued from it. The Referee sustained the claim, which being taken by exception to the special Judge (sitting by regular appointment in the place of the Judge of the Fifth Circuit) was overruled, and an appeal from his judgment brings the question to this Court.

It is contended on the part of the creditors that the grantees of the ferry, two of them the qualified executors under the will, and the other named executor, but never qualifying, stood in relation to the estate as trustees, and, occupying that fiduciary position, they must be regarded as holding the ferry and its rents and profits for the benefit of the creditors. The argument proceeds upon the ground that

when the petition was submitted to the Legislature and the charter granted, the land in fact " belonged to the estate," and that, as the Legislature granted the charter on "account of the pretended ownership, all benefits arising therefrom should belong to the creditors."

There was no charge of fraud or improper dealing, on the part of the petitioners, in the mode or manner by which the grant was obtained, and the appellants must rest on the naked principle of equity, which they contend entitles them to the relief they seek.

In December, 1865, the right and title to the land, of which, in their petition, they averred ownership, was in them, not in either of them as executors, but in all of them as devisees. It was subject to the lien of judgments which existed against the testator at the time of his death, but still the fee was in them, subject to their control until divested by a sale under the judgments. They had a right of entry with all the incidents which a legal title conferred.

A distinction is to be borne in mind between the right of an executor and that of a devisee to enter upon the land and enjoy the profits. It is clear that a mere executor, having no title in the land himself, would be bound for the rents and profits to the devisees or creditors if he received them. The executor derives from the will no title to the real estate, as he does to the personal property. When the character of executor and devisee combine in the same person, there, on entry, the presumption is that it is made as devisee, and not as executor, because the act will not only be referred to the right but the greater interest, on the general principles which usually govern the motives and influences of human action. Here, however, the executors made public declaration that they held as devisees, for they aver, in their petition to the Legislature, that they were the owners of the soil.

" The rents and profits of the real estate of one who has died insolvent belong to the heirs, and not to the executors or administrators, until such real estate be sold for the debts of the insolvent, or by order of a competent Court."—Bac. Ab., Ex'ors. & Adm'rs., H., p. 3.

In *Gibson et al.* vs. *Farley et. al.*, 16 Mass., 285, it was held that the heirs of a deceased insolvent are entitled to the rents and profits of the real estate of the deceased, until it is sold for the payment of debts.

An analogy is there drawn to the case of an estate mortgaged. " So long as the creditor permits the heirs of the mortgagor to re-

tain the possession, the rents and profits are taken by the heirs." No distinction prevails between the rights of the heir and the devisee to the enjoyment of the real estate, until deprived of their title to it by a sale for the payment of debts.

In *Jewell* vs. *Jewell*, 8 Rich. Eq., 296, it was held "that where an administrator received the rents of the real estate of the intestate, he is liable to account to heirs for the rents thus received."

·Chancellor Harper said in *Fripp* vs. *Talbird*, 1 Hill's Ch., 144, " In a case, decided by myself as Chancellor, at Columbia, I held, after very full consideration, that an heir-at-law in possession was not accountable for rents and profits."

In *Hull* vs. *Hull*, 8 Rich. Eq., 296, it is said of real estate, " The title does not vest in the personal representative, nor has he any control of such property, except what may result from the provisions of the will. If it is devised, unless devised to the executors, or power is given him to dispose of it, he has no power to interfere with it, and the devisee takes it without his assent."

The general principle of the common law, as to the right of the heir, or devisee to enter on, and enjoy the land, is affirmed by the Act of 1789, 5 Stat., 111, which excludes such right where the party in possession, engaged in making a crop with slaves, dies after the first of March : the growing crop is declared assets in the hands of the personal representative for payment of debts, &c., and the emblements of the land, before the last day of December following, are also like assets, but all after that period severed shall pass with the lands.

The residuary devise, under the will of J. J. Kinsler, was not absolutely void. It vested the title to the real estate upon which it operated in the devisees named. Until they were deprived of it by a sale under some proper proceeding for the payment of the debts of the testator, there was no paramount title in any other person, nor was it affected by any trust as to the rents and profits. In *Fripp* vs. *Talbird*, 1 Hill Ch., 143, it is said, " that even where a deed is void as against creditors, until seizure of the property, the party in possession is not bound to account for the rents and profits."

The Legislature, however, had the power to grant a charter for a ferry at the place designated without any regard to the ownership of the landings. We are bound to presume that all the formalities of the law were complied with, which are required on applications for franchises of this character. The right to establish a ferry is an incident of sovereignty, and an individual·can be lawfully deprived

of his land where it is necessary for the purpose.—*Stark* vs. *Mc-Gowan*, 1 N. & McCord, 387. The chartered interest in the ferry does not depend on the fee-simple right of the soil, and the owner thereof, in consequence of such original right, could not prevent the use of the ferry.—*Gourdin* vs. *Davis & Lehre*, 1 Bail., 472.

The case of *Huson* vs. *Huson*, 1 Rich. Eq., 1, presented an entirely different question from the case now before the Court. There the intestate had contracted for the purchase of land with the unexpired term of a ferry. It was presumed, as it was the duty of the administratrix to complete the purchase and take a conveyance, that she had so done. Still continuing administratrix, she obtained a re-charter of the ferry in her own name. Chancellor Harper, in his Circuit decree, held her responsible for the rents and profits. The decision was rested on the analogy to the doctrine of renewals of leases by trustees or tenants, the general principle which governs it being, "that if trustees, mortgagees and persons interested obtain renewal, the new lease is always subject to the trusts and limitations of the old." There is another circumstance in that case which distinguishes it from the one before us. There the possession of the administratrix was as a tenant in common with her children, and she was, therefore, a trustee to preserve the estate for the rest.

In relation to the claim of William Kinsler under the McFie judgment, there is much confusion as to the parties against whom it is supposed to have been obtained. From the report of the Referee it would seem that the plaintiffs in it were the administrators of McFie, and the defendants, Daniel Kinsler, J. J. Kinsler and William Kinsler, the two latter sureties.

William Kinsler, in his testimony, says that the debt was a bond for $5,000; that it was put in suit, and before judgment he paid $2,500 and the accrued interest in cash; that the judgment was against him and J. J. Kinsler; that he also paid the last $2,500 on his bond with Frost and Shuler, which he had given when he made the cash payment. The argument of the counsel, in support of the equity of William Kinsler to be subrogated to the rights of the plaintiffs in the McFie judgment, treats it as one against William and J. J. Kinsler. We have, therefore, to consider the claim as under a judgment against them.

If we felt at liberty to look behind the certificate of the Clerk of the Court of Common Pleas, which contains an abstract of a judgment of administrators of McFie *vs.* William and J. J. Kinsler, Fall Term, 1848, $2,500, interest from 1st of January, 1849, date

of substitution, November 6, 1868, we would be obliged, from the proof before us, to conclude that no such judgment was then obtained.

In the first place, the copy of the return of Mr. Bryce, the administrator of McFie, made to the Ordinary in 1849, introduced by William Kinsler, shows not only the full payment of the bond, on July 1, 1848, on which the judgment is averred to have been founded, but contains the items of the settlement. William Kinsler paid the first $2,500 in cash, and yet the return, which, in fact, is equivalent to a receipt and discharge to the obligees, shews that the cash paid was only $1,608, the balance of the principal and interest having been paid and settled in Hamburg Bank stock, the bond of William Kinsler, Frost and Shuler, and the note of J. J. Kinsler, endorsed by Frost. If the debt was then admitted by the plaintiffs to have been paid, how, or why, did the defendants allow the suit to proceed to judgment? There was no evidence of any stipulation, at the request of William Kinsler, that, notwithstanding the full settlement of it, Bryce should still pursue it to judgment, not only against J. J. Kinsler, but against himself. If the purpose of the latter was, through the plaintiffs in the action, to get the benefit of a lien on the property of J. J. Kinsler, the object could have been accomplished through a judgment against him alone. The bond to McFie must have been joint, or joint and several. How, then, could one judgment have been obtained on it only against two of the three obligees? The amount of the judgment, as claimed, seems to be inexplicable, when tested by the course of the Common Pleas, either in regard to verdicts or assessments. If the debt was $2,500, and the judgment obtained at October Term, 1848, why was it that it carried interest only from the following January ?

Giving, however, full effect to the abstract certified to by the Clerk, as shewing the existence of such a judgment, we cannot, in the face of the circumstances in proof, hold it as still unsatisfied against the said J. J. Kinsler. Full twenty years had elapsed from its rendition before the said William Kinsler took any step for its collection, and, although the stay law may have been regarded as operative for five years of that period, yet, conceding this supposed suspension, together with the fact of war, and the general distress which followed as a consequence, we think the lapse of fifteen years, with the attendant circumstances, raise a presumption of the fact of payment too strong to be resisted.

William Kinsler was a party defendant in the cause. At June Term, 1867, an order was passed which required creditors to come in and prove their demands against the estate of J. J. Kinsler, on or before 1st January, 1868. Within the prescribed time he presented his claim under his mortgage of September, 1848. Although having an interest as devisee and creditor, he allowed an order *pro confesso* to be entered against him for default of answer, and never preferred his demand under the judgment until the 20th of October, 1868, over nine months after the period first limited, and then on his petition the time was extended. It would have been more satisfactory if a copy of the mortgage had appeared in the brief.

It is averred, however, by Wm. Kinsler, to have been executed to protect him against a liability as surety on the McFie debt, and yet it is in the penal sum of $8,000 to secure $4,000. If the mortgage was for the alleged purpose, why was it given only for $4,000, when the whole liability was for $5,000; and if only given as indemnity against his co-surety, then why was it taken for $4,000 instead of $2,500, one-half of the whole debt? If the judgment was unsatisfied at the death of the testator, being the oldest against him, and binding the whole of his real and personal estate, why did he not seek the collection of his debt through the source by which the full amount of his debt could have been realized, instead of resorting to the mortgage, which only had a specific lien? J. J. Kinsler owned, at his death, besides personal property, real estate of large value, which brought, at public sale, under this cause, (excluding the mortgaged tract,) $54,111.16. The mortgaged piece was bid off for $2,403.35. Can a conceivable reason be suggested why the creditor, having a general and a specific lien for the same debt, refrained from availing himself of that process through which full payment was the most likely to be obtained?

It is not usual for a mortgagee of real estate to enter into possession, and yet here he not only entered, but retained possession for nineteen years. At the death of the testator, his real estate must have largely exceeded in value the price at which it was sold in 1868 and '69, for it is in proof that, besides his land in Lexington County, it consisted of at least twenty parcels in the city of Columbia, on the most, if not all, of which, the buildings were destroyed on the invasion of the Federal army in February, 1865. How long he had owned the various city lots does not appear, but it certainly is not improbable that a man of such large possessions could, at any time, for years before his death, have met the comparatively small

.32A

sum of $2,500; it surely could have been realized by the enforcement of the judgment.

We have no reason to doubt that William Kinsler testified according to the best of his belief. Human memory, however, is fallible, and it is not strange that the account which he gives of the several transactions, some of them dating back to twenty years, does not produce conviction, when it is opposed by facts and circumstances so strong that they must lead to a different conclusion.

We have not had the benefit of the views which the special Judge took of the claim under the judgment, but as he overruled so much of the report of the Referee as related to it, we are to presume that he differed from him in his conclusion of the presumption of payment on the proof made.

We concur with the Referee in the conviction that at the death of the testator, no such judgment existed against him open and unsatisfied.

The claim remaining to be considered · is that of James B. Gibson, who was employed by the executors on the 13th of July, 1866, to act as watchman over the real estate, to prevent the cutting of wood by trespassers, and the taking and carrying away of the bricks of the buildings which had been destroyed. It will be remembered that this was no demand against the testator at his death, and the fund to be administered by the Court consists of the proceeds of his real estate, against all of which liens then existed.

In *Rutledge* vs. *Hazlehurst*, 1 McC. Eq., 467, it was held that legal assets must be distributed under the Act of 1789, (5 Stat., 111,) after satisfying all liens existing at the death of the debtor. (See also *Keckley* vs. *Keckley*, 2 Hill Ch., 256.) Although, under the said Act, debts due to the public are to be paid next in order to funeral expenses, yet it was held in *Commissioners of Public Accounts* vs. *Greenwood et al.*, 1 Dess., 450, that the State had no prerogative to be paid out of the effects of the debtor in preference to any of the citizens who have judgments, mortgages, or other liens.

The opinion of the Court of Appeals in *Haynsworth* vs. *Frierson*, 11 Rich., 478, recognizes the principles involved in the prior decisions, which limit the order for the payment of debts as directed by the Act to such assets as remain after satisfaction of liens existing at the death of the testator or intestate. Here the debt was contracted by the executor, and the fund which is derived from property bound by judgments and a mortgage cannot be dimin-

ished against the creditors who held them to satisfy a claim, however meritorious it may be, which did not exist at the death of the testator, and for payment of which the holder must look to the party with whom he contracted.

It is ordered and adjudged that so much of the Circuit decree as relates to the claim of the said Gibson, and to the ferry and its rights and incidents, be affirmed, and so much thereof as relates to the judgment of the administrators of McFie, claimed by William Kinsler, be reversed. It is also ordered that the case be remanded to the Circuit Court, that the proper orders may be taken to carry out the directions of this Court as expressed in its opinion.

*Willard*, A. J., and *Wright*, A. J., concurred.